IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>PLAINTIFF,<br><br>V.<br><br>$123,370.89 IN FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER XXXXXXXX3390 HELD IN THE NAME OF DEMS HOLDINGS LLC; $234,368.88 IN FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER XXXXXXXX6802 HELD IN THE NAME OF RYJ INTERNATIONAL GROUP INC; $195,701.44 IN FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER XXXXXXXX5282 HELD IN THE NAME OF UNI LEVANT LLC; AND $685,504.95 IN FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER XXXXXXXX2077 HELD IN THE NAME OF ROYAL HEALTH PRODUCTS CORPORATION,<br><br>DEFENDANTS. | CIVIL ACTION NO. |

## VERIFIED COMPLAINT FOR FORFEITURE

COMES NOW, the United States of America, Plaintiff in the above-styled

civil action, pursuant to 21 U.S.C. § 881(a)(6), 18 U.S.C. § 981(a)(1)(A), and

18 U.S.C. § 981(a)(1)(C), and files this verified Complaint for Forfeiture, showing the Court as follows:

## INTRODUCTION

1.     On or about February 19, 2021, agents with the United States Department of Homeland Security - Homeland Security Investigations ("HSI") seized the following funds:

a.  $123,370.89 in funds seized from Bank of America account number XXXXXXXX3390, held in the name of Dems Holdings, LLC ("Defendant $123,370.89");

b.  $234,368.88 in funds seized from Bank of America account number XXXXXXXX6802, held in the name of RYJ International Group, Inc. ("Defendant $234,368.88");

c.  $195,701.44 in funds seized from Bank of America account number XXXXXXXX5282, held in the name of Uni Levant LLC ("Defendant $195,701.44"); and

d.  $685,504.95 in funds seized from Bank of America account number XXXXXXXX2077, held in the name of Royal Health Products Corporation ("Defendant $685,504.95"),

(collectively, the "Defendant Funds").

2.      The Defendant Funds are presently located within the jurisdiction of this Court and are in the custody of the United States Customs and Border Protection ("CBP").

3.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1345 and 1355.

4.      This Court has *in rem* jurisdiction over the Defendant Funds pursuant to 28 U.S.C. § 1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred in this district.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because the acts or omissions giving rise to the forfeiture occurred in this district, and pursuant to 28 U.S.C. § 1395 because the property is located in this district.

## FORFEITURE STATUTES

6.      Pursuant to 21 U.S.C. § 881(a)(6), all moneys and things of value that were furnished or intended to be furnished in exchange for a controlled substance, that constitute proceeds traceable to such an exchange, or that were used or were intended to be used to facilitate the sale or exchange of a controlled substance in violation of 21 U.S.C. §§ 841 and 846 are subject to seizure and forfeiture to the United States.

7.      Pursuant to 18 U.S.C. § 1956(a)(1)(A)(i), it is a crime for any person

to knowingly conduct or attempt to conduct a financial transaction involving proceeds of a specified unlawful activity with the specific intent to promote the carrying on of a specified unlawful activity.

8.      Pursuant to 18 U.S.C. § 1956(a)(1)(B)(i), it is a crime for any person to knowingly conduct or attempt to conduct a financial transaction involving proceeds of a specified unlawful activity with the intent to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

9.      18 U.S.C. § 1956(c)(7) defines, in relevant part, a "specified unlawful activity" as any act or activity constituting an offense listed in 18 U.S.C. § 1961(1).

10.     18 U.S.C. § 1961(1) includes, as part of the list of offenses, "dealing in a controlled substance or listed chemical."

11.     Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in or traceable to a transaction or attempted transaction in violation of 18 U.S.C. § 1956 and/or 1957 is subject to forfeiture to the United States.

12.     Additionally, pursuant to 18 U.S.C. § 981(a)(1)(C), any property which constitutes or was derived from proceeds traceable to a violation of any offense constituting a "specified unlawful activity" is subject to forfeiture to the United States.

4

## BASIS FOR FORFEITURE

### A. The Investigation

13.    Since on or about early December 2020, HSI investigators began investigating a vast network of U.S.-based companies that have been receiving millions of dollars via bulk cash deposits in unusually frequent and suspicious pattern since at least 2018.

14.    Most of the cash deposits occurred in cities historically known for drug trafficking activity, such as Los Angeles, Chicago, Atlanta, Miami, and New York City.

15.    The investigation revealed that those cash deposits were proceeds derived from suspected narcotics trafficking, and that the companies receiving the deposits laundered the funds as part of a Black Market Peso Exchange ("BMPE")[1] operation benefitting a Latin American drug trafficking organization ("DTO").

16.    BMPE activities usually have the following indicators:

- Shell corporations that lack any internet presence but claim to be

---

[1] A BMPE is a specific form of trade-based money laundering, which is an umbrella term used to describe the many ways money laundering organizations ("MLOs") can manipulate business records, import/export records, and other business processes to hide narcotics proceeds within seemingly legitimate enterprises that conduct international business.

in an industry heavily associated with international commerce (electronics, textiles, etc.).

- Interstate cash deposits occurring on the same day or within a narrow timeframe.

- Significant and repetitive cash deposits and/or Currency Transaction Reports, peer-to-peer bank transfers, or deposits that otherwise seem unusual for the given industry.

- Immediate wire transfers after receiving cash deposits to high-risk countries in Latin America.

- Use of pass-through accounts in order to conceal the origin and destination of narcotics proceeds.

- Discrepancies on wire transfer memo lines - for example, one wire transfer memo line may state "purchase of hand sanitizer," while the next memo line states "purchase of used vehicles".

- Periods of high-volume activity (deposits and wire transfers) followed by periods of cessation of activity.

- Foreign visitors to the United States opening bank accounts while on temporary or restricted statuses.

17.    HSI identified several individuals involved in the bulk deposits of

cash into various bank accounts. One of these individuals, a Source of Information ("SOI"), admitted depositing millions of dollars into bank accounts associated with several U.S.-based companies in 2020.

18.    On or about December 15, 2020, HSI located SOI's vehicle, which was later seized by a repossession company. The repossession company provided HSI with consent to search the car.

19.    Inside the vehicle, HSI investigators found a large stack of bank deposit slips from JPMorgan Chase, Bank of America, and PNC Bank, as well as a receipt for a wire transfer at a money services business.

20.    According to the SOI, she/he received and deposited bulk cash for a money laundering organization ("MLO") over an extended period of time.

21.    The SOI conducted that activity under the direct control of a Mexican DTO, which the SOI believed to be the Mexican Los Zetas Cartel.

22.    The SOI claimed she/he was recruited in early 2020, hoping to make extra money and working more stable hours.

23.    As a condition of accepting the recruiter's job, the SOI was required to bring on one additional person to assist with the work.

24.    The SOI recruited an individual (hereinafter, "CC1").

25.    The SOI and CC1 left their jobs, received airplane tickets from their

recruiter, and traveled to Atlanta, Georgia.

26.     In February or March 2020, the SOI and CC1 met with two unidentified individuals, as well as their recruiter, at an Atlanta restaurant.

27.     During the meeting, the two individuals informed the SOI and CC1 that they would receive large sums of cash daily, and that they were required to receive, count, identify, and remove counterfeit currency, then deposit the money into bank accounts.

28.     Soon thereafter, the SOI and CC1 received instructions as to which bank accounts they were to deposit the money, as well as training on how to conduct money pickups, search collected money for counterfeit currency, and how to prepare the collected money into $1,000 to $10,000 bundles for bank deposits.

29.     They were further instructed to keep the deposits under $10,000 to avoid "red flags" at the bank.

30.     The "red flag" reference likely related to the filing of a Currency Transaction Report which is required for bank transactions exceeding $10,000.

31.     Depositing money under $10,000 specifically to avoid the filing of a Currency Transaction Report is a violation of 31 U.S.C. § 5324.

32.     After receiving their training, the SOI and CC1 began working

without supervision.

33.     The SOI and CC1, working in tandem, received daily text messages with instructions to pick up approximately $100,000 to $250,000 of currency, usually in parking lots of retail stores.

34.     The SOI and CC1 then deposited the money in various bank accounts.

35.     After a few weeks of depositing money, the SOI felt that she/he had made a mistake in accepting that work opportunity, and within a few weeks the SOI realized that she/he was likely working for a Mexican DTO or MLO to launder drug proceeds.

36.     Because the SOI conducted money pickups primarily from different individuals, and the money was so excessive in quantity, the SOI realized that there was no legitimate business purpose for the activity, and she/he was in fact laundering drug proceeds.

37.     The SOI received a 1% commission on the money she/he deposited into the bank accounts. The MLO set that commission rate.

38.     As part of the money laundering process, the SOI and CC1 would first provide pictures of U.S. dollar bill serial numbers in their possession to the MLO.

39.     The SOI and CC1 would then receive instructions from the MLO to meet a money courier in a public parking lot.

40.     Upon meeting the courier, SOI and CC1 would provide one of the specific U.S. dollar bill serial numbers to the money courier to confirm their identity for the exchange of the cash.

41.     The SOI and CC1 would then count the money and receive specific instructions into which bank accounts they were to deposit the funds.

42.     The SOI and CC1 used "burner" phones to text pictures of the cash and deposit receipts to their handlers working for the MLO.

43.     The SOI and CC1 also utilized an encrypted phone application, which automatically deletes the messages after a certain time, to communicate with the MLO.

44.     The SOI and the CC1 traveled between Atlanta and several large metropolitan cities in the United States to engage in that activity.

45.     The MLO determined where to send the SOI and CC1 based on which cities were "dry," or lacking a significant amount of drug proceeds to launder.

46.     The SOI and CC1's travel, lodging, and occasional food expenses were paid by the MLO.

47.     The SOI stated that CC1 recruited three additional individuals ("CC2", "CC3", and "CC4").

48.     The SOI and CC1, CC2, CC3, and CC4 continued money laundering until on or around September 21, 2020 when investigators with the Drug Enforcement Administration ("DEA") encountered CC1 and CC2 in Chicago, Illinois.

49.     DEA investigators arrested CC2 and a Mexican national and seized approximately $200,000 in bulk cash from them.

50.     Investigators found CC1 that same day at a residence in Chicago, Illinois, and CC1 provided consent for the DEA to search the residence.

51.     During the search, investigators located $15,000 in bulk cash, financial ledgers that showed deposit activity, multiple small backpacks and suitcases, a money counter, and bank deposit slips.

52.     DEA investigators conducted a consensual interview of CC1, during which CC1 admitted to picking up and laundering between $1-2 million in Atlanta, Georgia and approximately $1 million in Chicago, Illinois in 2020.

53.     When asked if CC1 knew where the money came from, CC1 stated that he/she wasn't sure but believed it was possibly narcotics related.

54.     Following CC1's encounter with DEA investigators, SOI continued

to work with another Spanish-speaking individual to pick up and launder bulk cash in other parts of the United States until December 2020.

55.     The SOI and the co-conspirators did not have any legitimate income during the timeframe in which they conducted this activity.

56.     As such, there were no legitimate sources for any of the bulk cash that SOI and the co-conspirators deposited into the following accounts:

   a.   Bank of America account number XXXXXXXX3390, held in the name of Dems Holdings, LLC ("BoA 3390");

   b.   Bank of America account number XXXXXXXX8820, held in the name of YC Restoration, LLC ("BoA 8820");

   c.   Bank of America account number XXXXXXXX2077, held in the name of Royal Health Products Corp. ("BoA 2077")'

   d.   Bank of America account number XXXXXXXX6802, held in the name of RYJ International Group, Inc. ("BoA 6802"); and

   e.   Bank of America account number XXXXXXXX5282, held in the name of Uni Levant LLC ("BoA 5282").

57.     The recovered financial ledgers and bank deposit slips referenced bulk cash deposited into the abovementioned bank accounts, which are depicted in the following chart:

| Document Type | Bank Account | Amount Deposited |
|---|---|---|
| Ledger Notebook | BoA 3390 | $50,000 |
| Ledger Notebook | BoA 3390 | $50,000 |
| Ledger Notebook | BoA 3390 | $50,000 |
| Ledger Notebook | BoA 3390 | $25,000 |
| Bank Deposit Slip | BoA 3390 | $10,000 |
| Bank Deposit Slip | BoA 3390 | $9,824 |
| Bank Deposit Slip | BoA 3390 | $1,500 |
| Ledger Notebook | BoA 8820 | $30,000 |
| Ledger Notebook | BoA 8820 | $19,000 |
| Ledger Notebook | BoA 8820 | $33,000 |
| Ledger Notebook | BoA 8820 | $10,000 |
| Ledger Notebook | BoA 8820 | $8,000 |
| Ledger Notebook | BoA 8820 | $21,000 |
| Ledger Notebook | BoA 8820 | $7,800 |
| Ledger Notebook | BoA 8820 | $18,000 |
| Bank Deposit Slip | BoA 8820 | $10,000 |
| Bank Deposit Slip | BoA 8820 | $10,000 |
| Bank Deposit Slip | BoA 8820 | $10,000 |
| Ledger Notebook | BoA 2077 | $7,500 |
| Ledger Notebook | BoA 2077 | $30,000 |
| Ledger Notebook | BoA 2077 | $10,000 |
| Ledger Notebook | BoA 6802 | $10,000 |
| Ledger Notebook | BoA 6802 | $5,000 |
| Ledger Notebook | BoA 6802 | $5,000 |
| Ledger Notebook | BoA 6802 | $5,000 |
| Ledger Notebook | BoA 6802 | $5,000 |
| Ledger Notebook | BoA 5282 | $13,000 |

## B. **The Bank of America Accounts**

### a. *BoA 3390*

58.   A review of BoA 3390's financial records showed that the account

was opened on May 7, 2018 by Martin Rodriguez ("Rodriguez") using an

Argentinian passport.

59.     Records show that Rodriguez selected "Nonresident Alien Status" as his residency status in the United States.

60.     The records also indicated that BoA 3390 belongs to Dems Holdings, LLC, a company registered in Delaware and incorporated on April 19, 2018.

61.     HSI investigators found no internet presence for Dems Holdings, LLC, or the specific industry in which the company allegedly does business.

62.     A sample of the deposit activity for BoA 3390 from September to November 2020 reveals several red flags for BMPE activity, including the following:

- 78 cash deposits made in numerous U.S. states (Georgia, specifically the Northern District of Georgia, Florida, Ohio, California, etc.), totaling $583,965.

- None of the 78 cash deposits exceeded $10,000.

- A nearly equal amounts of debit-to-credit activity, indicating that the account primarily operates as a pass-through account (credits totaled $950,000, while debits totaled $1,031,224.75).

- 22 outbound wire transfers totaling $945,935.

- 11 of the 22 outbound wire transfers benefitted a Panamanian bank

account belonging to Rodriguez.

- No evidence of legitimate business expenses, such as payroll deductions, advertising/marketing bills, payment processing fees, or rent and utilities payments, etc.

### b. *BoA 8820*

63.    A review of BoA 8820's financial records show that it was opened by Yesenia Contreras ("Contreras") on June 6, 2020.

64.    The account belongs to YC Restoration LLC, which was incorporated on May 13, 2020 and registered in Oklahoma.

65.    A sample of BoA 8820's deposit activity from October 2020 to January 2021 raises red flags for BMPE activity, including:

- 109 cash deposits made in numerous U.S. states (Georgia, specifically the Northern District of Georgia, Texas, Illinois, etc.) totaling $827,153.

- None of the 109 cash deposits exceeded $10,000.

- A nearly equal amounts of debit-to-credit activity, indicating that the account primarily operates as a pass-through account (credits totaled $832,731.99, while debits totaled $853,528.23).

- No evidence of legitimate business expenses, such as payroll

deductions, advertising and/or marketing bills, payment processing

fees, or rent and utilities payments, etc.

c. *BoA 2077*

66.    BoA 2077 was opened by Sahir Jose Gonzalez Rodriguez

("Gonzalez-Rodriguez") on April 6, 2017 using a Venezuelan passport and

identifying himself as a convenience store owner.

67.    BoA 2077 belongs to Royal Health Products Corporation, which was

registered in Delaware and incorporated on March 31, 2017.

68.    A review of Bank of America records for the account reveal many

red flags, such as:

- 13 cash deposits made in numerous U.S. states (Georgia, specifically

  the Northern District of Georgia, California, Illinois, etc.), totaling

  $102,000.

- None of the 13 cash deposits exceeded $10,000.

- 64 incoming peer-to-peer transfers totaling $533,149.01 from

  multiple individuals and corporations.

- The majority of the peer-to-peer transfers did not exceed $10,000.

- 69 incoming wire transfers totaling $1,042,144.52 from corporations

  associated with the medical industry, as well as many other

corporations that don't have any internet presence.

- Many of the incoming wire transfers originated from Venezuela, Argentina, Panama, British Virgin Islands, and India, all of which are countries known to be active in BMPE.

- No readily apparent evidence of legitimate business activity, such as payroll expenses, advertising and/or marketing bills, payment processing fees, or rent and utilities payments, etc.

### d. *BoA 6802*

69. BoA 6802 was opened on June 11, 2018 by Xuxin Ruan ("X. Ruan") and belongs to RYJ International Group Inc, a company registered in California and incorporated on September 6, 2013.

70. Yijia Ruan was listed in financial records as the Chief Executive Officer of RYJ International Group Inc.

71. Financial records also revealed a number of red flags for BMPE activity, including but not limited to:

- 17 cash deposits made in numerous U.S. states (Georgia, specifically the Northern District of Georgia, New York, California, etc.) totaling $87,120.

- None of the 17 cash deposits exceeded $10,000.

- 312 incoming P2P transfers totaling $205,635.05 mostly from individuals with Hispanic names.

- Only two of the 312 P2P transfers exceeded $10,000.

- 17 outbound wire transfers to mostly China-based entities, totaling $1,416,293, which transfers benefitted corporations that appear to have vastly different industries, such as "motorcycle trading" and "meat trade".

- Limited legitimate business activity - a total of $13,157.54 in withdrawals related to normal operational functions, such as payroll deductions, advertising and/or marketing bills, payment processing fees, or rent and utilities payments, etc.

e. _**BoA 5282**_

72.   On or about February 9, 2019, Ghassan Mashal opened BoA 5282.

73.   BoA 5282 belongs to Uni Levant, LLC, a company registered in Georgia and incorporated on October 1, 2018.

74.   BoA 5282's financial records reveal several red flags for BMPE activity, such as:

- 17 cash deposits made in numerous U.S. states (Georgia, specifically the Northern District of Georgia, Florida, Illinois, etc.) totaling

$59,140.

- None of the 17 cash deposits exceeded $10,000.

- 1,394 incoming P2P transfers totaling $730,049.59 mostly from individuals with Hispanic names.

- Only three of the 1,394 P2P transfers exceeded $10,000.

- 22 outbound wire transfers to mostly China-based entities, totaling $916,430.65.

- A relatively small amount of legitimate business transactions.

## C.  Seizure of the Defendant Funds

75.    On or about February 19, 2021, HSI seized the Defendant Funds as described in paragraph 1 above.

76.    On or about April 7, 2021, Ghassan Mashal filed a claim with CBP on behalf of Uni Levant LLC, contending that Uni Levant LLC is an innocent owner of the Defendant $195,701.44. Pursuant to 18 U.S.C. §983(3)(A), CBP referred the matter to the United States Attorney's Office for the Northern District of Georgia.

77.    On or about April 29, 2021, Sahir J. Gonzalez Rodriguez filed a claim with CBP on behalf of Royal Health Products Corporation in which he contended that the corporation was an innocent owner of the Defendant $685,504.95. Pursuant to 18 U.S.C. §983(3)(A), CBP referred the matter to the United States

Attorney's Office for judicial forfeiture proceedings.

78.   On or about May 6, 2021, Gustavo D. Lage filed a claim with CBP on behalf of Dems Holdings, LLC, contending that Dems Holdings is the owner of Defendant $123,370. 89. Pursuant to 18 U.S.C. §983(3)(A), CBP referred the matter to the United States Attorney's Office for judicial forfeiture proceedings.

79.   On or about May 26, 2021, RYJ International Group Inc, filed a claim with CBP contending that it is the owner of the Defendant $234,368.88. Pursuant to 18 U.S.C. §983(3)(A), CBP referred the matter to the United States Attorney's Office for judicial forfeiture proceedings.

80.   The Defendant Funds are subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) on the grounds that they were furnished or were intended to be furnished in exchange for a controlled substance, that they constitute proceeds traceable to such an exchange, or that they were used or were intended to be used to facilitate the sale or exchange of a controlled substance in violation of 21 U.S.C. §§ 841 and 846.

81.   The Defendant Funds are subject to forfeiture to the United States pursuant to 18 U.S.C. §981(a)(1)(A) because they were involved in or are traceable to a money laundering transaction or an attempted money laundering transaction in violation of 18 U.S.C. §§ 1956 and/or 1957.

82.     The Defendant Funds are subject to forfeiture to the United States pursuant to 18 U.S.C. §981(a)(1)(C) because they constitute or were derived from proceeds traceable to a specified unlawful activity – the illegal distribution of controlled substances.

WHEREFORE, Plaintiff prays:

(1)     that the Court forfeit the Defendant Funds to the United States of America;

(2)     that the Court award Plaintiff the costs of this action; and

(3)     that Plaintiff have such other and further relief as the Court deems just and proper under the facts and circumstances of this case.

This 7th day of July 2021.

Respectfully submitted,

**KURT R. ERSKINE**
*Acting United States Attorney*

/s/Radka T. Nations
**RADKA T. NATIONS**
*Assistant United States Attorney*
Georgia Bar No. 618248
600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
Telephone: (404) 581-6000
Radka.Nations2@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

    PLAINTIFF,

    *V.*

$123,370.89 IN FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER XXXXXXXX3390 HELD IN THE NAME OF DEMS HOLDINGS LLC; $234,368.88 IN FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER XXXXXXXX6802 HELD IN THE NAME OF RYJ INTERNATIONAL GROUP INC; $195,701.44 IN FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER XXXXXXXX5282 HELD IN THE NAME OF UNI LEVANT LLC; AND $685,504.95 IN FUNDS SEIZED FROM BANK OF AMERICA ACCOUNT NUMBER XXXXXXXX2077 HELD IN THE NAME OF ROYAL HEALTH PRODUCTS CORPORATION,

    DEFENDANTS.

CIVIL ACTION NO.

## **VERIFICATION OF COMPLAINT FOR FORFEITURE**

I, Special Agent John D. Walker, have read the Complaint for Forfeiture in this action and state that its contents are true and correct to the best of my

knowledge and belief based upon my personal knowledge of the case and upon information obtained from other law enforcement personnel.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This 7th day of July, 2021.

_____
**JOHN D. WALKER**
*Special Agent*
United States Department of Homeland Security
Homeland Security Investigations